IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Scott D. McIntosh being first duly sworn, hereby deposed, and state as follows:

## INTRODUCTION

1. I am a law enforcement officer currently assigned as a Task Force Office with the Drug Enforcement Administration (DEA). I began my law enforcement career in February 1996 at the Kentucky State Police (KSP).  I was initially assigned to KSP Post 8-Morehead (1996-1998), then to KSP Post 7-Richmond (1998-2004), and lastly to KSP DE/SI East Branch (2004-2017) throughout my career in various roles as a trooper.  While with KSP, I was solely assigned to narcotics investigations in 2004 and subsequently assigned to the DEA Lexington Resident Office (LRO) in 2009 until I retired from KSP in 2017.  After retirement from KSP, I continued my career in law enforcement with the Madison County Sheriff's Office in 2017 where I was once again assigned to the DEA LRO and remain there currently.

2. In my capacity and years of experience as a detective and DEA TFO, I have conducted numerous narcotics investigations at both the state and federal levels involving controlled substance offenses, ranging from simple possession of those substances to the unlawful distribution of drugs including, but not limited to, methamphetamine, cocaine, marijuana, prescription pills, heroin, and fentanyl.  I have conducted investigations utilizing confidential informants to purchase narcotics from suspects, as well as conducted the purchase of narcotics in undercover capacities.  I have also submitted sworn affidavits in support of search warrants and assisted in the execution of state and federal search warrants.  I have conducted interviews and proffers with a variety of individuals, including those who have provided information and/or

assisted law enforcement as confidential informants or sources of information, individuals who were involved in the use or abuse of controlled substances, and individuals involved in the distribution of narcotics at varying levels.

3. In addition to my personal experience investigating narcotics-related offenses, I have obtained information from other law enforcement officers at federal, state, and local levels. It is common for law enforcement to share information regarding investigations and narcotics trafficking trends. Through my training and experience, I have become familiar with narcotics trends, methods, pricing, and the differences between use and distribution quantities of various narcotics, including, but not limited to, methamphetamine, heroin, cocaine, marijuana, prescription pills, and fentanyl.

4. This Affidavit is submitted in support of a federal criminal complaint and arrest warrant for Maurice D. GATEWOOD (DOB 2/27/83) for violations of federal law. Specifically, there is probable cause to believe that GATEWOOD has committed offenses in violation of 21 U.S.C. § 841(a)(1) (Distribution of Methamphetamine and Fentanyl) on or about March 2, April 2, and April 21, 2026.

5. The information in this affidavit is based on my participation in this investigation, information provided to me by other law enforcement officers involved in this investigation, and my discussions with other law enforcement agents and witnesses. The information contained in this affidavit does not describe the entirety of this investigation but sets forth only those facts relevant and necessary to determining probable cause for the requested criminal complaint and arrest warrant.

**PROBABLE CAUSE**

6. In November of 2025, agents with the Drug Enforcement Administration (DEA) received information of suspected drug trafficking occurring at the residence of Maurice GATEWOOD located at 1333 Centre Parkway, Apt. # 62C, Lexington, Kentucky 40517 (hereinafter, "Subject Premises"). Following the receipt of this information, investigators began conducting surveillance at the Subject Premises. During various times of surveillance, DEA investigators observed individuals coming and going from the residence and staying only a brief time before departing. Some of these individuals were observed coming and going from the residence multiple times in the same day and, again, only for short periods of time. Based on your Affiant's training and experience, brief encounters, such as those observed during this period of surveillance, are consistent with and indicative of drug distribution as these short trips frequently reflect that business transactions are taking place within the residence rather than normal social exchanges.

7. In February of 2026, your Affiant was provided information from a qualified and reliable DEA confidential source (CS) working for potential consideration as to Kentucky state criminal charges. Specifically, the CS identified the Subject Premises as being occupied by a black male known to the CS as "Dre." According to the CS, "Dre" was known by the CS to distribute various types and amounts of narcotics from the Subject Premises throughout the day. The CS further identified "Dre" as being the CS's primary source of supply (SOS) for various narcotics for the sole purpose of distribution. Specifically, the CS explained that they had obtained such substances as heroin, fentanyl, cocaine, and crystal methamphetamine from "Dre" over the previous six (6) months.

The CS stated that they had also observed several individuals coming and going from the residence to purchase illegal narcotics from "Dre" directly while the CS was present. The CS explained that "Dre" would often go into a back left room within the Subject Premises to retrieve illegal narcotics. The CS believed that "Dre" stored illegal drugs and proceeds in the back left room for security and safekeeping purposes. The CS also provided first-hand knowledge that "Dre" possessed a firearm which the CS described as a pistol style firearm. Based on training and experience, it is common for drug traffickers to possess or carry firearms on their person or within reach in order to protect themselves, their narcotics supply, and/or their narcotics proceeds.

The CS identified the phone number of (859) 346-7356 as the number utilized by "Dre." According to the CS, they have paid "Dre" for illegal narcotics in the past either in cash or through CashApp. The CS provided two CashApp names/address they have utilized to pay "Dre" for narcotics in the past: "Maurice Gatewood" and "Janika Turner." Investigators provided a photograph of GATEWOOD to the CS who identified GATEWOOD as the subject the CS knew to be "Dre."

8. During March and April of 2026, investigators utilized the CS to conduct three (3) controlled drug purchases from GATEWOOD at the Subject Premises. Prior to each buy, the CS would text or call GATEWOOD via the (859) 346-7356 telephone number, either days in advance or on the same day as the transaction, to inquire whether GATEWOOD had substances available for sale and/or to notify GATEWOOD that the CS would be coming to him.

a. On March 2, 2026, investigators utilized the CS to conduct a controlled drug transaction with GATEWOOD at the Subject Premises. The transaction was audio/video recorded. Investigators, conducting surveillance, observed the CS enter the Subject Premises.

Several individuals were inside; however, the CS only discussed a drug purchase with GATEWOOD who was also inside the residence. In the background, a blender was in operation. Based on training and experience, it is common for drug traffickers to use a blender to "cut" their narcotics by mixing the narcotics with a "cutting agent" to increase the amount of supply for distribution. During the transaction, GATEWOOD provided the CS suspected narcotics which the CS handed over to investigators following the controlled buy. During a post-buy debrief, the CS confirmed that the subject known to them as "Dre" provided the narcotics. The narcotics were submitted to the DEA lab for analysis where the narcotics were confirmed to be (1) 219 grams of methamphetamine at 94% purity, yielding a total of approximately 205.8 grams of methamphetamine (actual) and (2) approximately 13.95 grams of a mixture containing fentanyl, tramadol, and acetaminophen. Based on training and experience, your Affiant is aware that substances such as tramadol and acetaminophen are common "cutting agents."

b. On April 2, 2026, investigators utilized the CS to conduct a second controlled drug transaction with GATEWOOD at the Subject Premises. The transaction was audio/video recorded. Investigators observed the CS knock on the door of the Subject Premises and then being let in by a black male. Once inside, the CS met with GATEWOOD who sold various suspected narcotics to the CS. The CS exited the Subject Premises, continuing to speak with GATEWOOD into the common hallway. After the conclusion of the conversation, GATEWOOD re-entered the Subject Premises. The CS met with investigators and provided them with two (2) baggies containing approximately one (1) ounce of suspected fentanyl in total, forty (40) "M/30" pills suspected to contain fentanyl, and ten (10) "R/P 20" pills suspected to be oxycodone. During a post-buy debrief, the CS confirmed that the subject known to them as "Dre" provided the narcotics. The suspected narcotics were submitted to the DEA lab for analysis. The lab has

since confirmed that the two baggies of suspected fentanyl were, in fact, mixtures weighing 13.977 and 13.693 grams, respectively, containing fentanyl. In addition, the DEA lab confirmed that the forty (40) "M/30" pills also contained detectable amounts of fentanyl. The remaining pills are still pending laboratory analysis.

c. On April 21, 2026, investigators utilized the CS to conduct a third controlled drug transaction. The transaction was audio/video recorded. During the controlled transaction, the CI was observed knocking on the door of the Subject Premises and being let inside by GATEWOOD. While inside, GATEWOOD retrieved suspected narcotics from the back left room of the residence. GATEWOOD, then, sold approximately one (1) ounce of suspected fentanyl (in two baggies) along with forty (40) "M/30" pills believed to contained fentanyl. During a post-buy debrief, the CS confirmed that the subject known to them as "Dre" provided the narcotics. These items were submitted to the DEA lab for analysis. The DEA lab has since confirmed that the two baggies of suspected fentanyl were, in fact, mixtures weighing 25.83 grams and 2.38 grams, respectively, containing fentanyl. During the transaction, GATEWOOD also provided a price for approximately one (1) pound of methamphetamine, indicating a future sale for narcotics.

9. Your Affiant has worked with the CS for approximately two (2) months, and the CS has conducted three controlled transactions with GATEWOOD at the Subject Premises which is consistent with the audio/video recordings of the transactions reviewed by your Affiant. The information provided by the CS has proven to be accurate and truthful. Your Affiant is unaware of the CS providing any false information. For these reasons, your Affiant believes the CS to be credible and reliable.

## **CONCLUSION**

10. Based on the foregoing, there is probable cause to believe that on or about March 2, April 2, and April 21, 2026, that Maurice D. GATEWOOD knowingly and intentionally distributed methamphetamine (actual) and fentanyl, Schedule II controlled substances, thus committing violations of 21 U.S.C. § 841(a)(1). I, therefore, respectfully request the issuance of the proposed criminal complaint and arrest warrant.

Respectfully submitted,

/s/ Scott D. McIntosh

Scott D. McIntosh
DEA Task Force Officer

Sworn to me and subscribed by telephone in accordance with Fed. R. Crim. P. 4.1 and 41(d)(3) on the __13th__ day of ___May___, 2026.

UNITED STATES MAGISTRATE JUDGE